May we see it, call the next case. 3-0-8-0-7-4-1, Keith and Shem's Company, with the counsel Robert Schemers, versus Keshav Walker Insurance Services, et al. I believe they're going to win. Mr. Schemers, you may proceed. Good afternoon, Your Honors. I'm going to please the court, counsel, for the plaintiff appellant, Robert Schemers, from Pretzel and Stauffer in Chicago. Your Honors, this is an appeal in an insurance coverage declaratory judgment action from the circuit court of the 10th Circuit, Tazewell County, beautiful downtown Keegan, Illinois. In this case, there are actually three issues before, Your Honors. I have a time limit to address all of them, but if I fail to address an issue, I do not waive it, and I will stand on my boots. Late notice. Two members of this panel are not strangers to late notice, and I'm sure the third isn't as well. Justice Litton, you are a dissenter in West American versus Yorkville National Bank. Justice McDade, you work for the majority. 388, bill at 3769, I think. I'm not going to that tomorrow in the Supreme Court. Even though you're on both sides of that case, this case doesn't involve the actual notice issue. This case involves a tender of defense, albeit admittedly late. They admit 38 months after service or process. The suit was filed in November of 2001, served in December of 2001. And the very first notice, Aiken Insurance Company, of the Burnett lawsuit was the end of January 2005. They admit that in their answer to paragraph 10 of the complaint we filed. It's not in dispute, 38 months. Now, the reason they say for this tardiness, unmistakable late notice, and what the circuit court held to be the reason for it was in 2004, September 7, 2004, Mr. Burnett filed an amended complaint where for the very first time he alleged disparagement. And disparagement, according to the circuit court judge, is covered. Therefore, because there was a covered lawsuit, there was an obligation to give notice to Aiken Insurance Company. I suggest to your honors that when you review the policy of insurance and its notice provision, which is no different than the notice provision two of the three of you looked at in Western American versus Yorkville National Bank, it doesn't require coverage. What it says is you have an obligation, Mr. Insurer, to give notice of a suit as soon as practicable. Illinois courts from north to south have interpreted as soon as practicable in a notice provision to mean within a reasonable time. And I dare say 38 months is unreasonable as a matter of law. Yorkville, 27 months was unreasonable as a matter of law. Yorkville and Bobbitt Bank. One of the issues this court looks at when it applies the reasonableness test from our Supreme Court in Comfort Mutual versus LaVorse is one, the specific language of the notice provision. As soon as practicable, it's clear and unambiguous and no court in Illinois has ever held to the contrary. The second factor, sophistication of the insurer. Who could be more sophisticated in the world of insurance than an insurance agency and the insurance professionals who were named along with it in the underlying lawsuit? I dare say other than appellate court justices and frustrated appellate lawyers who do a lot of coverage work, no one's more sophisticated. The fact that awareness that they were sued is the third factor. They knew they were sued. They were served and they were defending themselves for almost three months. No, I said almost three years at the time the amended complaint was filed. And then diligence in giving notice. Well, the amended complaint was filed September 7, 2004. Notice wasn't given until January 2005. That having been said, the bottom line is there is nothing in the policy which says you give notice of a covered suit. The notice provision says you have an obligation to give notice of any suit. No court in Illinois has ever done what the circuit court did here. And that is limit the notice provision to a covered lawsuit. It's not up to the insurer to make the coverage call. The insurer's obligation and who knows better than an insurance agent, broker, professional than how to comply with the terms of its own policy, especially the policy it brokered itself to give notice to the insurance company. It's the only obligation the insurer has under the policy. Tell the company about the lawsuit. They did it here 38 months after the suit was filed. And I submit it is laid as a matter of law. Now when they come up and argue, they're gonna tell you about the Supreme Court case of Barrington Consolidated School District. It doesn't apply. In that case, what the Supreme Court held was when the accident occurred involving a teenage girl from a high school falling over gym equipment during gym class. What the Supreme Court held was there was no reason, no reason for the school district to believe that a lawsuit would follow. No reason for a claim. So when the lawsuit was filed and it was tendered by the school district to its carrier and the school district said no, the Supreme Court said that's wrong. That wasn't notice of a suit. That was notice of a claim. What they held was you get good notice of a lawsuit, but the incident, the occurrence, the accident took place four years prior to the filing of a lawsuit. You should have told us about that. What the Supreme Court said was there was no obligation for the insurer to report that as a claim because they had no idea that a claim would come. There was nothing according to the Supreme Court in all of the three-page decision that a claim would follow. Therefore, there was no merit to the late notice defense raised by the insurer and the Supreme Court held they had a duty to defend. That was notice of an occurrence. Here we're talking about unmistakable admitted notice 38 months after filing based on what the circuit court held was an amendment which pled into coverage and I submit that is incorrect. What this court can do is it can reverse as to Burnett alone and then address the other issues because as to Brophy's lawsuit against the same defendants, there is no issue as to notice. The issue there is disparagement. Disparagement and the applicability of the professional services exclusion and the policy that the insurance agency purchased. Now it's interesting that the circuit court judge would say as to Burnett that the filing of the amended complaint somehow triggered something special because it required a duty to defend. And if you look at the allegations, all they did is they took the tortious interference applications and stuck the word disparagement in there. They're identical facts. And that's what the circuit court didn't do. It didn't look at the facts unless because as we all know, labels don't matter. You can put, players put labels on things. They have a count for breach of contract. They have a count for disparagement. They have a count for tortious interference. The operative facts in all three are the same. At least in two are the same as to disparagement and as to tortious interference. It was contacting customers and telling them that the plaintiff is no longer with the agency and do they want service on their business. That's what was done. In one count, it was alleged to have been done tortiously, interfering with business expectancy. In another count, it was said to be disparaging. Well, disparagement is covered if it's not part of a professional service. Tortious interference is not covered no matter what. The fact is, as to the Burnett lawsuit, it really doesn't make a difference because they can't possibly give you an excuse for 38 months late notice. Not because the policy doesn't get triggered by a covered lawsuit. It gets triggered by any lawsuit. As to Mr. Brophy's lawsuit. Isn't there some circumscription there that you, I mean, any lawsuit. That's what the notice provision says. Remember it says. If somebody walks in and slips and falls in their office, you're to be noticed. In a lawsuits file? Yes. That's not even covered under your policy. Under our policy, that's exactly what's covered. It's a business owner's policy. It doesn't cover professional liability. What it covers is operation of the premises as an insurance agency. Four walls, a roof, and a floor and a door to walk in. That's what it covers. What they do as professionals is not covered. That's covered by a professional liability policy. And all the briefs talk about the difference in these coverages. Our notice provision says that the insured has an obligation as soon as practicable to give notice of any lawsuit, summons, or suit papers, and to turn them over immediately. They didn't do that. 38 months. Now, with respect to Mr. Brophy's lawsuit, which is- It just says, the policy it issued, the language is, as if a claim is made or suit is brought. It doesn't use the term of our, any, that I, as I recall reading in those. That's correct. If a claim is made or suit is brought against any insured, you must notify us as soon as practical. Right, so don't you have to employ the test of what claim or suit, I mean, you have to use this, it has to, you have to reasonably foresee that it would be a lawsuit involving that policy, involving that type of coverage. I mean, I know you said that isn't, they're, they don't decide if you cover or not. That's correct. But it wouldn't seem that, you talk about any insured here, well, if I get into a car wreck, am I supposed to give you notice? It says if a claim is filed against me, or suit, I mean, obviously you're not talking about that, are you? Depends what kind of car was used. They may have non-owned automobiles. Well, but you are saying the words any, any, so I'm driving, you know, my private car, and I'm in a wreck. What you said was they'd have to notify, because I'm insured. If it weren't any, I misspoke. I'll stand corrected, Your Honor, on that point. The fact is no court in Illinois has ever held you give notice of a covered suit only. That's not up to the insurer. Even the Supreme Court on the Barrington case didn't go that far, and they quoted it out of context in that regard. Right, but I mean, actually, if you could reasonably foresee that this would be something that this policy would cover, you would be notified, correct? Who would know better than how to give notice than someone whose business is counseling its own customers in how to give notice? Isn't that a sophistication argument? Can't that be turned on its head? I mean, here are people who are very, very sophisticated in this business, and they know that the original action doesn't implicate you, as they're insured. But when the amendment's filed, they know very well that that's implicated, and then give you notice a couple months later, whatever it was, three months later. Well, respectfully, Your Honor, I would disagree with that. First of all, no court has yet permitted and insured to make the coverage call with respect to the lawsuit that forms the basis for notice. The policy requires notice of a suit. They were sued. They admittedly did not give notice until 38 months after that occurred. They gave notice after also the filing of an amended complaint, which pled disparagement. But as I said, when you analyze the facts of the disparagement count, and look at the sources of interference count, they're virtually identical. If they want to play roulette or gamble with whether or not their notice is timely, I would say to the court, based on the Yorkville decision, they lost that gamble. They lost that bet. Their notice is unmistakably, admittedly, 38 months late. With respect to the disparagement count, if time permits me to address that, the disparagement count here is really no different than the tortious interference count. As to Mr. Brophy, there aren't even letters. As to Mr. Brophy, there are allegations that I had a contract, a producer's agreement I entered in 1993, which they told me in January 2001 they would terminate. And in those letters they told me, they would continue to service my business until the first one of two things happened. Either a letter of, a broker of record letter came, or a policy renewal. He then alleges that they breached the contract by not servicing the business, and he then alleges, in a tortious interference count, that they went to my customers, which were their customers, and asked for broker of record letters, and they, in the count for disparagement, they also said I wasn't in the business any longer, and tried to steer the business in that way. Now this is a suit by an insurance professional against insurance professionals and an insurance agency. What could be more professional? The contacts of the customer base of each plaintiff was part of a business plan by the agency to keep the business. They were their customers, brought in by each of these men that left, whatever circumstances, is not relevant to the coverage dispute, and that was part of the business. If it was part of the business, then it is not covered, because the policy doesn't cover what they do as insurance professionals. There's a specific exclusion for rendering other failure, rendering professional service. They have other insurance for that, we assume, and you can't turn this policy into something it's not. If tortious interference is all that's alleged, it's not covered. When it becomes disparagement because of a label submitted to this court, it's still not covered. And if it is covered as disparagement, it's excluded because it came about as part of a professional service. My time is probably up. I'll reserve what I have left for rebuttal. Mr. Jones, I have just one quick question, going back to notice. Yes. Does Illinois law still make the distinction between an obligation to defend and an obligation to indemnify? Yes. And does the insurance company have an obligation to defend, even though it may think that there isn't coverage prior to a determination being made that there is? Yes. The case of your honor in Shuma's court well knows the duty to defend is far broader than the duty to indemnify. We're only concerned here today with whether there is a duty to defend. We're not interested in the duty to indemnify that wasn't part of the underlying litigation. There is a distinction, and this court is only concerned with whether Deakin Insurance has a duty to defend. And I submit to the court it does not. But with regard to notice, you don't be insured as to whether or not it thinks that there's coverage because it's looking for defense. Is that correct? That is correct. Thank you. Thank you, Mr. Chambers. Mr. Wentworth? May it please the court? My name is David Wentworth, and I represent all of the party defendants, the appelees, other than Mrs. Brophy and Burnett, who are represented by Brad Swearingen, who's at the council table. But we're not going to be splitting the argument. You've got me for the full 15 minutes. You need to chat with him. What is really telling, I believe, your honors, is that the briefs in this case, at the trial court level and at the appellate level, focused on reversing Phelan. And during the 15 minutes that they got to speak, Phelan, I don't believe, was mentioned once, other than in the introduction that disparagement was one of the three issues. Based on that, I'm going to focus on the notice issue as it relates to Mr. Burnett. There is no notice issue whatsoever with Mr. Brophy. So that notice is acknowledged by keeping insurance companies who have been timed. So if the notice issue goes against us, it only knocks out Burnett. Does not knock out Brophy. On the notice issue, however, that Barrington case that we referenced in our briefs has been turned into this straw man to be knocked down. The Barrington case isn't the main case on point. It's the Madden case that speaks in terms of what the court was asking the questions about. If the original complaint does not trigger coverage, and a later filed amendment does, the clock starts to tick from the complaint that would trigger coverage, that would come into play. In Madden, the issue was intentional and negligent conduct. So the original complaint as pled was all intentional conduct. No allegations of negligence. Only when it was amended to include allegations of negligence did notice be given and was coverage, or the duty to defend, triggered. What happened here is the initial complaint was filed. As Justice Lutton stole my thunder there, the knowledge kind of cuts both ways in this case. My clients realized that the original complaint as filed in the Burnett action did not afford coverage. Only after the Lexmark case, only after plaintiff's counsel in the two underlying actions realized that there was another way to go, did he amend the Burnett case and, around the same period of time, file for a new plaintiff a separate lawsuit in Brophy. That was done September of 04 and December of 04, and the notice was given January 26 of 05. So for Brophy, it was about a two month delay until notice. For Burnett, if you accept the Madden case, that the date starts to tick from the amended complaint, that's only a four, four and a half month case. We did, in our briefs, get into the issue of prejudice as to whether or not that is a necessary element and got into some of the areas that were addressed in the Yorkville decision of this court. However, I don't believe that that applies. Prejudice is not a factor that's applicable here because it's only four months. There's no showing in any of the record before this court of any prejudice whatsoever to Pekin Insurance by that four and a half month delay for notice. The cases cited by the plaintiff, I'm sorry, by Pekin Insurance, and as referenced by two of the three of you in the Yorkville decision, all speak in terms of prejudice having been existed. When you get down to the short end of that timeline, did the fight or loss happen? Did someone, was the evidence destroyed? Those types of issues were apparent as you get down to the lower end of the notice. We respectfully submit, further on the notice side, as Justice O'Brien, as you were questioning about what exactly does trigger coverage, the word suit is defined in the policy. And in that definition of the policy, it says that it means a civil proceeding in which damages because of several defined terms, from bodily injury, property damage, personal injury, or advertising injury, which is what's at issue here, to which this insurance applies are alleged. So again, the circular nature, the definitional section of the policy supports what happened here in this case as far as only getting notice once a covered suit was on file. Regarding the professional services, aspect of the case, the, excuse me, your honors, as I'm just in my right spot. Regarding the professional services in the briefs, followed by Pekin Insurance, they make a big deal of the definition of professional service being very expansive to cover anything. You don't have to be in a profession it just covers whatever your business does. So any business activity which involves specialized knowledge, labor, or skill. So taking a page out of Phelan, if you're a hairdresser, it would necessarily encompass your profession as being a hairdresser, whatever specialized knowledge, labor, and skill. It doesn't necessarily equate with whether you're licensed by a governmental agency or hold an insurance producer's license or anything like that. It just covers your line of work, your business. What Pekin Insurance tries to do in its briefs is equate business judgment with your business activity. The two are not the same. You need both. You need to have, in the State Street case, as cited by Pekin, in determining what professional service in that context was not, the court in State Street said that business judgment, if it's used in conducting the principal business activity, must be implicated to trigger the exclusion or to have the exclusion apply. So if you have business judgment being used in your principal business activity, that is what is excluded under the professional service policy, professional service exclusion. What we have here is a situation where the statement in the letter in the Burnett case and the oral statements in the Brophy case are statements that could be made by anybody in any line of work in any business whatsoever, that someone is gone. In fact, they went further and kind of said, and as a matter of fact, you're never gonna be able to buy insurance from them again. I mean, it was the ultimate kind of a death sentence, you know, that the code words used that they've voluntarily chosen to leave to pursue other interests. One could, there's many, many ways to read something into that, but for the sake of coverage, we have to, the rules of construction dictate that we have to give it all doubts in favor of the insured. To finish up on the professional services exclusion, the cases cited in the briefs from the Shaw case that involved Pekin Insurance Company to the Hearst-Roche to the Alliance Environmental, all three of those included the rendering of a professional opinion that was in the core business activity of the insured. So in Shaw, you had a fire adjuster, an insurance adjuster, giving a professional opinion that the fire damages submitted were fraudulent. They were sued for the basis of that opinion, and rightfully so, that triggered the exclusion, because that was the core belief, or the core business of that company. Likewise, in the Hearst-Roche engineering firm case by looking at a building inspection to see if the contractors worked with substandard, they were later sued for that professional opinion in the course and scope of their business activity. Likewise, finally, in Alliance Environmental involving Erie Insurance, you had an environmental inspection firm that gave a report as to whether or not all the asbestos was in fact removed from the school, when the third party didn't like being disparaged, because all three talk about disparagement being excluded under the professional services exclusion. When they got that bad opinion, they said, hey, we want to sue you, but the court said there's no coverage because it is so connected to the professional opinion, business judgment being exercised in your principal line of business. In the Instant case, we respectfully submit that the statements alleged in the complaint, and in that one sentence of the letter in the Burnett case, could be done in any business, do not get into the professional services of an insurance agency, no specific product was offered to be sold, no specific rider or coverage analysis for purported insured was made. So to that extent, the professional services exclusion does not apply. Regarding Phelan, in my few minutes left, five minutes left, regarding Phelan, in which Justice Lutton was involved, so you kind of are involved in both of the two cases that the counsel are going to be speaking about the most, I believe and respectfully submit to the court that Phelan was correct, got the right result. In Phelan, we had a hairdresser that on her way out the door of her current employer said to all the customers, hey, my former boss is shutting down, is leaving the business, is not going to be around anymore. Oh, by the way, we've moved, come over to the new place, so that at the end of the day, it was the ultimate in terms of disparaging, because it disparaged them out of existence. If you put somebody out of business or make statements that are untrue or misleading about the scope of their services, that put them out of business or that make it so that they're not there anymore, that triggers, or Phelan, that establishes disparagement. The issue in, with Phelan, in the briefs, Deakin Insurance has made a big deal out of the fact that Phelan purportedly ignored prior precedent from the Lexmark case and other cases that require an additional element of a negative denigration of the competitor's output or services. What better way to negate that output or negate those services than to say that they are no longer in business or that they've left to pursue other interests? It's the ultimate death sentence or death penalty of you being out of business. And in the service industry, these are not, in all of the Lexmark cases and all the other cases, those are product cases that the genesis developed out of unfair competition or Paul Maynard or Leonomac claims. Here, where there's services, it is much different in that if you put the person that can do the services out of business or say that they're no longer around, that in effect touches and negates their ability to provide that service. I think that because Phelan went up on a petition for me to appeal to the Illinois Supreme Court, which was denied, I'm sure that all of the hooks that you put in a PLA were in that PLA done by Mr. Chemers, the PLA was denied. So I believe it is good law that this court should follow. In the reply brief, there was a comment that we had mentioned stare decisis to continue to follow your prior precedent. And we were attacked for that. And a first district case was cited for the proposition that you need to do that only to follow the law of a court above you. Well, that's a first district case where there are multiple divisions. And one division of the first district doesn't have to follow another division of the first district. There's only one division, only one unified court in the third district. And that is this court. So that's kind of a red herring. In conclusion, we respectfully suggest and submit that coverage is afforded under the policies for disparagement based on the allegations of the amended complaint in Burnett and the complaint in Brophy, that the professional services exclusion does not apply to the, as it was stated in Pekin Insurance's own briefs, a rather generic statement, run-of-the-mill statement about someone no longer being in the field for which they're providing services. The complaint alleges that they were insurance producers before, during, and after they were in our employ. So they were competitors. Finally, on the notice as to Burnett, we respectfully submit that it was only from the date that the amended complaint that added new causes of action with different elements, the elements between tortious interference or business expectancy and... Disparagement. Thank you. And disparagement are different. And based on that, they require a whole different set of facts that were pled in paragraph 12 of each of the counts that are in the record. Thank you. Thank you. No more questions? Thank you very much. Mr. Chambers for a reply. How much time do I have? Five minutes. In five minutes. Pekin versus Baylor, no matter how much I don't like you, I'm not gonna stand here and argue that in front of you all. I agree. I agree. We can all disagree, we're all professionals. The fact is, the case says what it says, we disagree with it, and we don't believe it applies. And we think one reason the circuit court judge relied on it in fact, it's the only case he cited, was because he was the circuit court judge in the underlying case that I lost, that I appealed to the court. Judge Barrett sat in Puyallup County then, and he moved him down to Tazewell for this case. That having been said, you could look at the allegations as we just heard from Mr. Wentworth. The only difference between tortious interference and disparagement is the insertion of the word disparagement and the changing of the label. Labels are irrelevant, as I indicated earlier. With respect to the Madden case, this court does not typically rely to create law on federal trial court decisions. It's a federal supplement decision, it's not the law. It's not Illinois law, it's not even federal law. There are 33 judges sitting in the Northern District of Illinois, and they're not bound by what each other says. They're not even bound by what they say themselves. So certainly, this court is not bound by the Madden case, the 16-year-old trial court decision. Madden is an aberration if it, in fact, says what counsel says it says, because no Illinois court has ever said the trigger of the obligation to give notice is when the insured recognizes that he has been sued with a covered lawsuit. That would create an impossible hurdle for the insureds in Illinois, especially because not all the insureds are sophisticated insurance professionals. Most of them are everyday people who, I dare say, would have never read the policy of insurance. All they do is they put a check in the mail when the premium's out. With respect to professional services, you can't compare this case to the federal. They're different policies, for one. That was a CGL policy, this is a business owner's policy. This is a business owner's policy that is designed not to cover the business. What it covers is the operation of the premises. It doesn't cover the operation of the business as a professional entity. That's why a professional buys professional liability coverage. That's why you don't expect auto coverage under your homeowner's policy. You don't expect general negligence coverage under an auto policy. This is a tailored policy issued to a professional for its business operations for premises. It doesn't cover the business operations as a professional entity, and that's what's at stake here. Two former professionals leave the business, sue the business with respect to how the business handled them once they were no longer there with respect to their book of business. This wasn't just attracting customers. This was going after a finite group of people who were brought into that agency by Mr. Burnett and by Mr. Brophy. They were their customer base, their book of business. That's who was contacted. Not all of Central Illinois, but only the people listed on whatever book of business they maintained. So where's the advertising there? Where's the widespread dissemination to the public at large, which is advertising Illinois? Although this court didn't say that in Phelan. All the other courts looking at advertising injury have. This court can reexamine Phelan if it chooses. That having been said, where's the advertising? Where's the disparagement? Why is tortuous interference when the word disparagement is stuck in front of it? Why are those identical facts now a claim for disparagement? I'd suggest to the court that they're not. It's a label. And what happened here is you have one lawsuit on file for three years, and then along comes the second lawsuit. Notice is given within weeks. That's why there's no issue with notice. And it is the iteration of the amended complaint in Burnett. They're almost identical. They're written by the same lawyer. Different plaintiff, same facts, same defendants, same termination date, same date of producer's agreement. Everything's the same except one is Robert Brophy, one is Tom Burnett. I'm not saying it's one man. Otherwise, they're identical. With respect to the all doubts are decided in favor of the insurer. That's all doubts are decided as to the insurer with respect to policy ambiguity, if there is one. They haven't claimed anything about these policies is ambiguous. In fact, this court held it was perfectly clear with respect to disparagement. This court held the notice provision is perfectly clear in the Yorkville National Bank case. I submit to this court, upon reflection, you have to consider what will happen in Illinois to the insurers. The motoring public, the business people out there, if the law becomes you have an obligation to give notice when you have a covered lawsuit. How are they to know when it's covered? Do you get sued? You have to go to the lawyer and say, am I covered? Or do you have the knee jerk reaction, the summons, the knock on the door, the sheriff hands you a summons, send it into the insurance company. That's what Illinois residents do. Some do it later than others, and they're met with late notice issues. Here, this was very calculated, very calculated. These are insurance professionals defended for three years, who then get notice 38 months after they're sued. For all these reasons, we ask this court to reverse. The alternative, we ask the court to reverse as to Burnett, and we could consider affirming as to Brophy, but I'm not asking you to affirm. Ask me to reverse the whole thing, or take Burnett out of the case. Thank you. Thank you. Thank you both for your arguments here today. This matter will be taken.